## Pullins et ux. v. Commonwealth.

(Decided Dec. 18, 1936.)

ROSS & ROSS for appellants.

B. M. VINCENT, Attorney General, and W. OWEN KELLER, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE CLAY—Reversing.

Marse Pullins and Ida Pullins were indicted for murder by the grand jury of Madison county. The material part of the indictment reads:

"That said Marse Pullins and Ida Pullins in the county aforesaid and before the finding of this indictment did unlawfully, wilfully, and feloniously and with malice aforethought kill and murder Eugene Beasley their son, and aged less than 14 years, by forcing him from their home and unnecessarily and unmercifully exposing him to the inclemency of the weather, without furnishing him with sufficient clothing or nourishment, and from which said neglect and treatment the said Eugene Beasley did die within a year and a day against the peace and dignity of the Commonwealth of Kentucky."

On their trial they were convicted of voluntary manslaughter and given a five-year sentence. They appeal.

The contention that appellants were entitled to a peremptory instruction requires a statement of the facts.

Appellants are colored people and in poor circumstances. They live in Maupintown, a colored settle-

ment about 10 miles west of Richmond. Their house contains three rooms, and was occupied by appellants, the deceased, Eugene Beasley, a son of Ida Pullins by a former marriage, and four other children. Eugene Beasley was about 13 years of age, and the oldest of the children. The only method of heating the house was an open fireplace, and the fuel consisted principally of firewood which was cut by Marse Pullins and Eugene and carried into the house. Eugene left home about 6 o'clock one Sunday morning the latter part of January, 1936, and went to the home of one Melvin Scott, where he remained until about 6 p. m. Sunday night. He appeared to be hungry, ate a hearty breakfast, but did not eat any more. On being asked by Melvin Scott if Marse had run him off, he replied, "No," but in reply to a similar question later on he said, "Yes." Scott asked him to stay all night, but Eugene went home. After his departure, he did not show up at home according to appellants, and nothing was seen of him until early Monday morning, when his brother found him sitting under a tree in the yard. He then came into the house, and it was discovered that his feet were frozen. He lingered for about 11 days and died from moist gangrene, caused by the frozen condition of his feet.

According to the evidence for the Commonwealth, Eugene was anæmic and undernourished, and was in the habit of going to the neighbors for food. After his death, his stomach was examined and found to be empty. There were several scars and bruises on his body. According to George Watts, Marse Pullins stated that he looked for Eugene, but Eugene never came back until about dark. Ed Mulligan called on the Wednesday following the time Eugene's feet were frozen and Ida Pullins said that he was getting along all right. Witness told Ida that the doctor was coming to see his brother and he would get him up there, but she acted like she couldn't hear for the kids. According to Charles Rhoddus, Eugene frequently went rabbit hunting with him, and they would be gone until about 7 or 8 o'clock in the evening. A few days before he got sick they went rabbit hunting, and when he returned he heard Marse whipping Eugene. Often Eugene came to his mother's house and asked for food. The clothes and shoes Eugene wore were very bad. While the boy lay ill, Ida Pullins said, "He's getting so hardheaded

and won't mind Marse. When he gets over this he's got to leave." Marse said, "Yes, when he gets over this I'm going to put him where everybody will know where he is."

On the other hand, the evidence for appellants is to the effect that Eugene was hardheaded, and in the habit of staying out and coming in most any time during the night. Eugene left Sunday morning and they did not see him again until he was found under a tree on Monday morning. When they found him, they bound up his feet in snow and Irish potatoes to draw the poison out. The boy got along fine until about the eleventh day after he was frostbitten. One day he was suffering pain from his neck to his stomach. They gave him some soda water and put a hot iron to his stomach. Apparently he got better, but later on his condition became worse, and appellants requested financial help from George Watts, an uncle of the child, with which to secure a doctor. Appellants had no money except such as Marse earned by an occasional day's labor. When the child died, Marse walked to his brother's home about 10 miles distant to get funds for the burial of the body, but was unsuccessful.

The theory of the Commonwealth is that Eugene returned home Sunday night, and he was either denied admittance, or driven out into the cold, without sufficient clothing or food to protect him from exposure, and in support of the conviction we are cited to Gibson v. Commonwealth, 106 Ky. 360, 50 S. W. 532, 20 Ky. Law Rep. 1908, 90 Am. St. Rep. 230, holding that where a mother, without malice, but unlawfully, willfully, and feloniously, casts her young child upon an open lot, without sufficient clothing to protect it from the weather, but hoping that it will be rescued, but by reason of such exposure it freezes to death, she is guilty of voluntary manslaughter, and predicating the rule on the following principle laid down in section 304 of Wharton on Homicide:

"If a person do or omit to do an act towards another, who is helpless and dependent, which act or omission, in usual, natural sequence, leads to the death of that other, the crime amounts to murder, if the act or omission be intentional; but if the circumstances are such that the person would not be, or could not have been, aware that the re-

sult would be death, that would reduce the crime to manslaughter, provided the death was occasioned by an unlawful act, but not such an act as showed a malicious mind. Thus, where a woman left her child, a young infant, at a door or other place where it was liable to be found or taken care of, and the child died, it would be manslaughter only, but if the child was left at a remote place where it was not liable to be found, and the death of the child ensued, it would be murder.''

The only evidence relied on to show that Eugene was denied admittance, or driven out into the cold Sunday night, is the statement of the witness George Watts, who said that Marse told him that the boy never came back until about dark, and the circumstance that he was found out under the tree the next morning. All this may be true, and yet the boy may have failed to ask admittance for fear of a whipping, or, having entered the house, may have left voluntarily. But, however that may be, there are other circumstances that distinguish this case from the case of Gibson v. Commonwealth, supra. In that case the child was only 2 months of age, and necessarily incapable of looking after or protecting itself in any way. In this case the boy was 13 years of age. He had strength and intelligence enough frequently to go rabbit hunting, and to call on the neighbors and ask for food whenever he was hungry, and generally to take care of himself. Within a few yards of the Pullins home were a number of residences where he could have gone and obtained shelter. Indeed, Melvin Scott asked him to stay all night and he refused to do so. Certainly if, upon reaching home, he was denied admittance, or driven out into the cold, he could have returned to Melvin Scott's and been taken in. It is practically certain that he did not stay out all night, for the weather was extremely cold, and, if he had, he would have frozen to death. Of course, one is often held criminally responsible on the ground that he must have intended the natural consequences of a particular act, but it can hardly be said that death from freezing is the natural consequence of driving out into the cold a boy who is mentally and physically capable of looking after himself and finding shelter only a few yards away. However reprehensible may have been the conduct of appellants, we are constrained to the view that they were not

guilty of murder, or any degree thereof. It follows that their motion for a peremptory instruction should have been sustained.

Whole Court sitting, except Judge Richardson.